IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 11-25717 MER |
| M'LISA A. MCKEE ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| ) | |
| RICHARD A. WIELAND, ) | Adversary No. 11-1730 MER |
| UNITED STATES TRUSTEE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| M'LISA A. MCKEE ) | |
| ) | Signed/Docketed |
| Defendant. ) | January 2, 2013 |

**ORDER**

This matter came on for trial on the Complaint for the Denial of the Debtor's Discharge Pursuant to 11 U.S.C. § 727(d)(1)[1] (the "Complaint") filed by the United States Trustee (the "UST"), and the Answer filed by the Defendant, Debtor M'Lisa A. McKee ("M'Lisa"). Based upon the evidence and legal argument presented by the parties, the Court makes the following findings of fact and conclusions of law.

**JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J), as it involves an objection to the Debtor's discharge.

---

[1] Notwithstanding the caption of the Complaint, the UST seeks relief pursuant to 11 U.S.C. § 727(a)(2) and (4).

## BACKGROUND FACTS[2]

M'Lisa filed her voluntary Chapter 7 petition on June 30, 2011, and Taya Sweeden ("Sweeden") was appointed Chapter 7 Trustee. M'Lisa filed her Statement of Financial Affairs ("SOFA"), Schedules and other documents necessary to complete the required initial filings in her case on July 5, 2011. Sweeden conducted a meeting of creditors on August 8, 2011, at which M'Lisa testified under oath.

M'Lisa and her ex-husband, Todd McKee ("Todd") are the parties to a dissolution of marriage proceeding in Boulder District Court, Case No. 2009 DR 641. On March 2, 2010, Todd and M'Lisa entered into a Separation Agreement which was approved as an order of the Boulder District Court (the "Separation Agreement"). As part of the property settlement, M'Lisa was awarded one-half of Todd's Fidelity Rollover 401(k) account, and M'Lisa was also awarded a joint 401(k) account. Thereafter, Todd took the necessary steps to transfer his interests in the two 401(k) accounts to M'Lisa.

In addition, M'Lisa was awarded 50% of Todd's bonus for the 3rd Quarter of 2009. M'Lisa was also awarded 40% of Todd's gross bonus income "as additional maintenance for as long as maintenance is payable (a term of five and one-half years [from March 2, 2010])."

M'Lisa does not dispute that she received a portion of Todd's gross bonus income during the periods reflected in her SOFA, Questions 1 and 2. M'Lisa also does not dispute she failed to include any "bonus" income in her response to Questions 1 and 2 in the SOFA. Instead the SOFA only reflects her regular monthly maintenance and child support payments from Todd.

As of March 2, 2011, Todd was the record title owner of a house located at 4518 Suncrest in Holliday, Utah (the "Suncrest House"). The Separation Agreement stated the Suncrest House was owned jointly by both Todd and M'Lisa, but the parties agree M'Lisa never had a record interest in that property. However, M'Lisa claimed "rental income" from the Suncrest House on her 2010 tax returns.

M'Lisa's mother Virginia Mageras ("Virginia"), occupied the Suncrest House and paid the mortgage and other expenses. According to the parties' stipulated facts, the Suncrest House was titled in Todd's name because Virginia was unable to obtain a loan in her own name.

---

[2] The background facts are taken in part from the parties' Stipulation of Facts, which was admitted at trial.

The Separation Agreement allocated whatever interest M'Lisa and Todd had in the Suncrest House to M'Lisa. It further provided M'Lisa or Virginia was to refinance the Suncrest House to remove Todd's name from the title, and Todd was to quit claim his interest in the Suncrest House to Virginia. Moreover, the Separation Agreement provided if the refinance or payment of the loan resulted in proceeds, those proceeds were awarded to M'Lisa as her property. However, M'Lisa disavows any entitlement to proceeds from the Suncrest House, because she maintains the Suncrest House belongs to Virginia and any proceeds would be Virginia's property.

The parties agree neither M'Lisa nor Virginia refinanced the Suncrest House. Further, Todd did not quitclaim the Suncrest House as contemplated by the Separation Agreement. Rather, on August 31, 2011, the Suncrest House was sold to third party buyers for the gross sale price of $260,000 and generated net proceeds after sale of $107,183.55. The net proceeds from the sale were deposited in Todd's bank account because he was the record title holder. Subsequently, Todd transferred the net proceeds to Virginia.

On September 27, 2011, Sweeden filed an adversary proceeding against Virginia and Todd seeking turnover of the net proceeds from the sale of the Suncrest House. Sweeden's adversary proceeding was ultimately settled by Todd's payment of the sum of $40,000 payable to M'Lisa's bankruptcy estate.[3]

M'Lisa acknowledged the redacted emails attached to the UST's complaint, as Exhibits D and E, are authentic.[4] She further acknowledged she communicated through those emails about the sale, closing, and distribution of proceeds with Virginia, Todd, and other parties. However, M'Lisa denies the emails were intended to assert an interest in the Suncrest House. Instead, she testified they were drafted in order to protect Virginia's interest in the proceeds from Todd.

## DISCUSSION

M'Lisa's nondisclosure of her interest in the Suncrest House, and her nondisclosure of her right to receive 40% of Todd's quarterly bonuses under the Separation Agreement form the factual basis of the UST's Complaint.

---

[3] UST's Exhibit 9.

[4] The e-mails were also admitted into evidence as UST's Exhibit 21 and M'Lisa's Exhibits 13 -17.

According to the UST, these omissions constitute fraudulent concealment under 11 U.S.C. § 727(a)(2)[5] and a false oath or account under § 727(a)(4).[6]

As described above, M'Lisa does not deny she failed to disclose the legal interest in the Suncrest House and entitlement to a portion of Todd's potential bonus income. However, she denies possessing the requisite intent or reckless indifference to the truth to justify a denial of her discharge.

A debtor's right to a discharge under § 727 is at the heart of the "fresh start" provisions of the Bankruptcy Code.[7] Exceptions to discharge are to be construed liberally in favor of the debtor, because a total bar to discharge is an extreme penalty.[8] Indeed, denial of discharge should occur only in extreme circumstances.[9] A party challenging a discharge bears the burden of proof by a preponderance of the evidence.[10]

---

[5] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[6] Section 727 provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless--

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>> . . .
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case--
>
>> (A) made a false oath or account. . .

[7] *See Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[8] *Rosen v. Bezner*, 996 F.2d 1527, 1534 (3rd Cir. 1993); *Martinez v. Los Alamos Nat'l Bank (In re Martinez)*, 126 Fed. Appx. 890, 897 (10th Cir. 2005) (unpublished decision); *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 915 (Bankr. D. Utah 2006).

[9] *Melarango v. Ciotti (In re Ciotti)*, 448 B.R. 694, 702, (Bankr. W.D. Pa. 2011).

[10] FED. R. BANKR. P. 4004, 4005; *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (1997).

### A. Concealment Under § 727(a)(2)(A)

A party objecting to discharge under § 727(a)(2)(A) must prove, by a preponderance of the evidence: (1) the debtor transferred, removed, concealed, destroyed or mutilated (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay or defraud a creditor [or an officer of the estate charged with custody of property of the estate].[11] Under § 727(a)(2), "[d]enial of discharge need not rest on a finding of intent to defraud.  Intent to hinder or delay is sufficient."[12]  "Fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[13]  Further, a number of circumstances may evidence actual intent to defraud under § 727(a)(2)(A), including:

> 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) the retention of possession, benefit or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence of a pattern or series of transactions after the onset of financial difficulties, or pendency or threat of suits by creditors; and 6) the general chronology of the events and transactions under inquiry.[14]

However, this list is not exhaustive.[15]

Here, there is a difference of opinion as to whether the interest in the Suncrest House was mentioned during the § 341 meeting.  Unfortunately, no transcript of the meeting was introduced into evidence.[16]

The Court has no reason to believe Sweeden's review of the recording was inaccurate.  Similarly, the Court finds M'Lisa's testimony that she believed she

---

[11] *OTE Canada v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir.2008) (quoting *Gullickson*, 108 F.3d at 1293).

[12] *United States Trustee v. Vigil (In re Vigil)*, 414 B.R. 743, 746 (Bankr. D.N.M. 2009).

[13] *Farmers Coop. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982); *see also Aweida v. Cooper (In re Cooper)*, 150 B.R. 462, 465 (D. Colo. 1993).

[14] *Cooper*, 150 B.R. at 465 (citation omitted).

[15] *Id.* at n.1.

[16] Sweeden testified she listened to the recording of the § 341 meeting before testifying.

mentioned the house to be credible. However, without a written transcript, the Court must give the benefit of the doubt to M'Lisa.

However, the Separation Agreement provided as follows:

> 4518 Suncrest: The parties are on title to the property located at 4518 Suncrest, Utah. This property was purchased for and is occupied by Wife's mother. To the extent the parties have an interest in the property, that interest is allocated to Wife. Wife and/or her mother, shall refinance this property so as to remove Husband's name from the loan within one year of the date of this Agreement. Husband and Wife shall execute a Quitclaim Deed transferring their interest to Wife's mother upon the refinance of the current loan on the property. Any payments made by Wife's mother on this loan shall be the sole property to Wife.[17]

Thus, despite the beliefs of M'Lisa and Virginia regarding the ownership of the Suncrest House, in reality, M'Lisa had an interest in the proceeds from the sale of that property.

In addition, according to a letter from Virginia to Sweeden, dated September 12, 2011, shortly before Sweeden filed her adversary proceeding:

> As a result of a business deal between Todd McKee and Mr. Yale Thomas, a close acquaintance of mine, that took place in 2007, I agreed to help offset some of that financial loss that Todd experienced in that business deal with Mr. Thomas. At that Time Todd McKee was married to my daughter M'Lisa, and I felt an obligation to help offset some of the loss they encountered with Mr. Thomas. The agreement was that upon the future sale of the Suncrest property I would provide a sum of approximately $45,000 to the McKee's for their loss. The reason behind this is that Mr. Thomas invested an amount approximately equal to that in the remodeling that was done to the Suncrest property. This was a goodwill gesture on my behalf and there were no written agreements.
>
> Upon the recent sale of the Suncrest property I agreed to allow Todd McKee to distribute the funds in a fashion that was fair and equitable to all involved with the agreement that I would still provide the $45,000 to Todd to distribute to M'Lisa McKee as had been agreed in 2007. It was further agreed that Todd would withhold the appropriate

---

[17] UST's Exhibit 5, M'Lisa's Exhibit 1, Separation Agreement, p. 8, ¶ 7.

> amount to cover any potential tax obligations he may incur as a result of the sale of my home.
>
> The agreement reached between Todd and me on Friday, September 9, 2011, was that I would receive $62,000 from the proceeds of the sale of my home and that $45,000, minus the tax amount withheld by Todd, would be presented to the M'Lisa McKee bankruptcy trustee on M'Lisa's behalf due to those proceeds being somehow related to the bankruptcy.[18]

The Court agrees with the UST the failure to disclose this interest is a "red flag" under the factors listed above, particularly as the Suncrest House was the residence of M'Lisa's mother. However, the Court does not agree M'Lisa's failure to disclose this fact constituted fraud or reckless disregard for the truth. The exhibits show M'Lisa was not an owner of the house under the deed, nor was she a party to the mortgage obtained by Todd.

The Court finds credible her testimony she believed the house to be Virginia's property, and that she had no recollection of the interest in the proceeds provided in the Settlement Agreement, and no recollection of the agreement for $45,000 of the proceeds to go to her bankruptcy estate.[19] She stated the divorce was contentious, and described her state of mind as focused on trying to get out of a bad situation, with the precise legal position of the house assuming a low priority. Moreover, she explained the issues surrounding the mortgage on the house and its sale arose from a bad investment made by Todd with Virginia's ex-boyfriend, and indicated Todd had prepared the tax returns on which rental income from the house was listed. Therefore, the Court concludes M'Lisa's handling of the information about her interest in the Suncrest House, while indicative of lack of attention on her part and perhaps on the part of her attorney, did not result from intent to commit fraudulent concealment, nor from reckless indifference to the truth.

With respect to Todd's bonus income, M'Lisa stated Todd told her bonuses were going to be erratic, so she did not put that income on her bankruptcy documents.[20] While the Court notes, in hindsight, she should have included a statement about such income and indicated it was not assured, the Court finds this exclusion to have been an honest mistake or the result of confusion.

---

[18] UST's Exhibit 19, M'Lisa's Exhibit 9.

[19] Indeed, pursuant to the letter from Virginia, it appears there were no written agreements as to the entitlement to proceeds from the Suncrest property, and it appears any agreements or understandings occurred primarily between Virginia and Todd.

[20] *See* M'Lisa's Exhibit 6.

For these reasons, the Court finds the UST has failed to prove by a preponderance of the evidence M'Lisa's discharge should be denied under § 727(a)(2)(A).

**B.     False Oath or Account Under § 727(a)(4)(A)**

Section 727(a)(4)(A) "is designed to ensure that the debtor provides honest and reliable information to the trustee and others interested in the administration of the estate without their having to conduct costly investigations to discover the debtor's true financial condition."[21]  In order to prevail under § 727(a)(4)(A), the UST must show by a preponderance of the evidence: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.[22]  In the case at bar, M'Lisa acknowledges she did not provide information about the Suncrest House or Todd's bonus income on her schedules.  Further, it is not disputed such information is pertinent to M'Lisa's bankruptcy case.  As to M'Lisa's knowledge of the falsity of the statements (or, in this case, the omissions), she testified she believed, albeit mistakenly, the items did not need to be disclosed because the house was Virginia's property and Todd's bonus income was uncertain.  This testimony, as well as other evidence, overlaps with the most important question under § 727(a)(4)(A), that of intent.

As with § 727(a)(2)(A), for purposes of § 727(a)(4)(A), "[f]raudulent intent may be deduced from the facts and circumstances of a case."[23]  Moreover, "[f]raudulent intent can also be demonstrated by showing that the debtor acted with reckless disregard, or the state of mind present when a debtor does not care about the truth or falsity of a statement, which is the equivalent of knowing that the representation is false and material."[24]  However, "[a]n honest mistake or oversight is not sufficient to deny a debtor his discharge."[25]

---

[21] *Melarango*, *supra*, at 703 (quoting *In re Singh*, 433 B.R. 139, 154 (Bankr. E.D. Pa. 2010)).

[22] *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 242 (Bankr. D. Colo. 2005).

[23] *United States Trustee v. Garland (In re Garland)*, 417 B.R. 805, 815 (10th Cir. BAP 2009).

[24] *United States Trustee v. Mosher (In re Mosher)*, 417 B.R. 772, 784 (Bankr. N.D. Ill. 2009) (internal quotations omitted).

[25] *Melarango*, *supra*, at 704 (quoting *Singh*, 433 B.R. at 154).

"Even a false statement resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent' sufficient to deny a discharge."[26]

The Court finds M'Lisa's omissions fall into this latter category. She indicated she was in a stressful situation at the time the bankruptcy was filed, and was preoccupied with concluding the divorce proceedings and with her children's welfare. In addition, she stated Todd had engaged in the transactions surrounding the house, and had told her his bonus income was erratic. Moreover, she was unfamiliar with the bankruptcy process. Such a combination of factors may have resulted in ignorance or carelessness on her part, but the Court finds such ignorance or car elessness did not constitute fraud or reckless disregard. It is troubling she did not amend her schedules when the omissions were brought to her attention, but the Court notes her attorney stated he did not believe such amendments were necessary. The Court disagrees – one of the first things a debtor faced with a § 727 action often does is file amended paperwork. However, the circumstances here support a finding that the failure to do so stemmed from the attorney's decision, not M'Lisa's malfeasance.

For these reasons, the Court finds the UST has not shown by a preponderance of the evidence M'Lisa's discharge should be denied under § 727(a)(4)(A).

## CONCLUSION

For the reasons stated above, and keeping in mind § 727(a) should be construed in favor of debtors, the Court denies the claims set forth in the United States Trustee's Complaint and the discharge shall enter in M'Lisa's Chapter 7 bankruptcy proceeding.

Dated January 2, 2013                BY THE COURT:

                                     Michael E. Romero
                                     United States Bankruptcy Judge

---

[26] *Id.* at 703 (citing *In re Oliver*, 414 B.R. 361, 374 (Bankr. E.D. Tenn. 2009)).